UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Vs. | :       13 CR 51 (MKB) |
| | : |
| MICHAEL KISSI, | : |
|       Defendant | : |
| _____ | : |

## SUPPLEMENTAL MEMO IN SUPPORT OF
## EMERGENCY MOTION FOR COMPASSIONATE RELEASE
Michael D. Weil
Federal Defenders of New York
One Pierrepont Plaza
Brooklyn, New York 11201
(718) 407-7413
Michael_weil@fd.org

April 28, 2020
Brooklyn, New York

Michael Kissi, through undersigned counsel, submits this supplemental memorandum of law in support of his emergency motion for compassionate release. The Court previously held any ruling on the motion in abeyance while the warden of the MDC reviewed his application. As his application to the warden was denied and thirty days have elapsed since the time of his request, the defendant has satisfied the waiting-period requirement under a plain reading of the statute. The defense thus renews its application, and asks the Court to consider this supplemental brief in support of the motion.

**PRELIMINARY STATEMENT**

The defendant seeks compassionate release under Section 3582 based on the combination of (1) the unique threat posed by COVID-19 to incarcerated persons, particularly those with underlying conditions such as Mr. Kissi, and (2) the excessiveness of Mr. Kissi's 10-year sentence relative to his crime. As to the first point, since the filing of the defendant's initial brief the threat to the defendant's health has only increased as the virus spreads within the Bureau of Prisons. Indeed, other courts in this district have granted compassionate release based on a defendant's hypertension in light of the special risks posed by COVID-19. As for his sentence, the defense refines its previous arguments and submits that the change in the standards governing the safety valve warrants a new sentence on the ground that the disparity between Mr. Kissi's sentence and the likely sentence of a comparable defendant sentenced today represents an extraordinary and compelling ground for relief. Even if the Court does not accept this argument, the inordinate length of the defendant's sentence, particularly in light of the health risks it poses, represents sufficient grounds for compassionate relief.

### A. The Defendant Has Satisfied the Waiting Period Requirement.

The defense understands Mr. Kissi's request for compassionate release submitted by email to the warden of the MDC on March 27, 2020, was denied. Because 30 days have elapsed since he filed that request, his motion is now ripe for review.

The government's argument in its April 10, 2020, letter that a defendant can only file a motion for compassionate release after "fully exhaust[ing] all administrative rights" is contradicted by the plain terms of Section 3582(c)(1)(A). The statute provides two direct routes to courts:

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier*[.]

§ 3582(c)(1)(A) (emphasis added). The statute simply does not say a defendant may bring a motion, upon "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility *without a response from the warden*" as the government would read it.

Because the motion was held in abeyance for 30 days this Court has the authority to adjudicate it now. *See, e.g.*, *United States v. Laureti,* No. 16-CR-60340, 2019 WL 7461687, at *1 (S.D. Fla. Dec. 17, 2019) ("A plain reading of the statute reflects that the Defendant may seek relief after the lapse of 30 days from the date the Warden receives the Defendant's request.").

The 30-day waiting period is a "built-in exception" to the statutory exhaustion requirement in Section 3582(c)(1)(A) that allows defendants to file a motion for compassionate release without fully exhausting administrative remedies. *United States v. Gross*, No. 15-CR-769, 2020 WL 1673244, at *2 (S.D.N.Y. Apr. 6, 2020). Under this exception, a defendant, like Mr. Kissi, who requests compassionate release from his facility's warden need only wait 30 days before seeking compassionate relief from a court. *See United States v. Russo*, No. 16-cr-441 (LJL), Dkt. No. 54

at 4 (S.D.N.Y. Apr. 3, 2020) (a defendant "must exhaust administrative remedies or wait 30 days before the Court can reduce his sentence").

Although the government includes a string cite of cases holding full exhaustion is required, the recent trend in this circuit is to treat the 30 days as a waiting period, not a full-fledged exhaustion requirement. "Importantly, § 3582(c)(1)(A) does not contain an exhaustion requirement in the traditional sense." *United States v. Haney*, No. 19-CR-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020). "Even the unusual structure of this specific requirement – which does not require full administrative exhaustion but only an exceptionally quick 30-day waiting period – suggests that the 30-day rule was intended as an accelerant to judicial review. *United States v. Sanchez*, No. 18-CR-00140-VLB-11, 2020 WL 1933815, at *4 (D. Conn. Apr. 22, 2020) (internal quotations omitted). "As the statute indicates, for the Court to entertain a motion by the defendant, Gonzalez must either have 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [his] behalf,' or 30 days must have passed 'from the receipt of such a request by the warden of the defendant's facility.' *United States v. Gonzalez*, No. 3:18-CR-00315 (KAD), 2020 WL 1940666, at *2 (D. Conn. Apr. 22, 2020). "Under normal circumstances, the thirty-day safeguard functions as an accelerant to judicial review, providing defendants with recourse to the courts after the lapse of an otherwise exceptionally quick 30-day period." *United States v. Roberts*, 18-CR-528-5 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020) (internal quotations omitted).

As Judge Rakoff explained in *Haney*:

> [T]he hybrid requirement in this statute—either exhaust or wait 30 days—substantially reduces the importance of the first purpose [i.e., protecting agency authority], as it allows a defendant to come to court before the agency has rendered a final decision. Indeed, anyone familiar with the multiple demands that the BOP has faced for many years in this era of mass incarceration can reasonably infer that Congress recognized that there would be many cases where the BOP

3

either could not act within 30 days on such a request or, even if it did act, its review would be superficial. Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release, and hence only limited him to 30 days before he could come to court in the ordinary course. Thus, the reduction of the wait period to a mere 30 days also "unquestionably reflects" a third purpose, i.e., "congressional intent for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released."

*United States v. Haney*, 2020 WL 1821988 at *3 (quoting *Gross*, 2020 WL 1673244, at *2) (quoting *Russo*, No. 16-cr-441 (LJL), Dkt. No. 54 at 4).

The First Step Act's amendment to 18 U.S.C. § 3582(c)(1)(A) was titled "Increasing the Use and Transparency of Compassionate Release." It was enacted against the backdrop of the BOP's infrequent use of compassionate release and was intended to increase *and expedite* compassionate release applications. *See, e.g.*, *United States v. Redd*, No. 97 Cr. 06 (AJT), 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) (discussing legislative history and Congressional intent); *United States v. Young*, No. 00 Cr. 02 (AAT), 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 4, 2020) (same); 164 Cong. Rec. S7753-01, 164 Cong. Rec. S7753-01, S7774. (noting the FSA "expands compassionate release under the Second Chance Act and expedites compassionate release applications"). Congress therefore included the 30-day waiting period "as an accelerant to judicial review." *Russo*, No. 16 Cr. 441 (LJL), Dkt. No. 54 at 5.

Requiring a defendant to fully exhaust administrative remedies beyond the 30-day limit could easily result in several-month delay given the multiple stages in the BOP's Administrative Remedy Procedure. *See* 28 C.F.R. § 542.[1] This would frustrate the FSA's goal of expediting requests for compassionate relief.

---

[1] For example, around the time the FSA was passed, the BOP averaged 141 days to process an approval of compassionate release and 196 days to process a denial. *See* Letter from Assistant Attorney General Stephen E. Boyd, (Jan. 16, 2018), https://www.themarshallproject.org/documents/4369114-1-2018-BOP-response

4

Without a doubt, most defendants seeking compassionate release are doing so because they are elderly, severely ill, and/or facing an imminent threat such as that posed by COVID-19. Subjecting these defendants to a lengthy administrative appeal process could cause irreparable harm. To avoid this problem, Section 3582(c)(1)(A)'s waiting period allows a court to adjudicate a motion for compassionate release after the passage of 30 days, regardless of where the administrative appeal process stands.

### B. The Medical Situation at the MDC and The Unique Risks Posed to Mr. Kissi Represent an Extraordinary and Compelling Circumstance.

Since the time of the defendant's initial submission, the COVID-19 pandemic has dramatically worsened. The grim statistics are doubtless well known to the Court and not repeated here. More than 60,000 Americans killed, more than in the Vietnam War. A million infected. The two counties in the United States with the most severe outbreaks – measured by both confirmed cases and deaths -- are Brooklyn and Queens.[2] The sound of sirens at night and the sight of refrigerated trucks outside hospitals are inescapable reminders.

While the city appears to have slowed the spread of the virus --- for now – the situation for those in custody remains perilous. At the time of defendant's initial filing on April 2, 2020, 75 inmates and 39 staff had tested positive. As of April 27, 2020 there were 1046 federal inmates and 330 staff who had tested positive for COVID-19. When the defense initially filed its motion, six federal inmate had died. That number is now 22.

It remains impossible to socially distance and maintain good hygiene in jail. Even with all of the BOP's protocols, new inmates and guards will continue to enter facilities after being

---

[2] Johns Hopkins University Coronavirus Resource Center at https://coronavirus.jhu.edu/us-map (last visited April 28, 2020).

potentially exposed in the outside world. And absent any sort of regular testing – the latest update from the MDC posted on the Court's website on April 28, 2020, indicates only 13 inmates there had been tested to date – the chance of an outbreak remains severe. Jails have become centers of some of the worst outbreaks. Almost 2000 inmates at a single prison in Ohio have tested positive for the virus, making it the worst outbreak in the United States.[3] If the MDC has been spared from the worst for now, that could change in an instant.

At the same time, medical understanding as to who is at most risk from the virus has improved since defendant's initial filing. It is clear hypertension, Mr. Kissi's ailment, is a significant risk factor for complications. A recent study found that nearly all patients hospitalized had a chronic health problem with hypertension being the most common. *See* Roni Rabin, "Nearly All Patients Hospitalized With COVID-19 had Chronic Health Issues, Study Finds," *New York Times*, April 23, 2020.[4] It is thus unsurprising that a number of courts have granted compassionate release motions based in large part on a defendant's vulnerability due to hypertension. *See United States v. Sawics*, No. 08-CR-287 (ARR), 2020 WL 1815851, (E.D.N.Y. Apr. 10, 2020) (waiving exhaustion requirement and granting compassionate release based on special risks from COVID-19 to those with hypertension); *Basank v. Decker*, No. 20-cv-2518 (AT), ––– F.Supp.3d ––––, ––––, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (noting that hypertension increases risk of harm from COVID-19, taking "judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality," and citing information from the CDC); *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020)

---

[3] "Cases Surge in an Ohio Prison, Making it a top U.S. Hot Spot," New York Times, April 20, 2020, available at https://www.nytimes.com/2020/04/20/us/coronavirus-live-news.html#link-4ced1d.
[4] https://www.nytimes.com/2020/04/23/health/coronavirus-patients-risk.html

(granting compassionate release in large part due to risks of COVID-19 complications from hypertension).

Accordingly, as previously submitted, the health risks due to COVID-19 for Mr. Kissi, either alone or in conjunction with the excessiveness of his sentence, is an extraordinary and compelling ground for relief.

### C. The Change to the Safety Valve Provision Creates an Unwarranted Disparity Between Mr. Kissi's Sentence and the Likely Sentence of a Comparable Defendant Sentenced Today and Thus a Compelling Ground for Relief.

The First Step Act enacted several changes to mandatory sentencing provisions, including: (1) removing the draconian stacking provision for multiple violations of 18 U.S.C. § 924(c); (2) reducing the maximum sentence for certain repeat drug offenders and narrowing the types of prior crimes that would cause someone to qualify for such a sentence; and (3) changes as to the availability of the "safety valve" in 18 U.S.C. § 3553(f) that allows some drug defendants to be sentenced without regard to any mandatory minimum. Unlike the provision making the changes to cocaine base sentencing in the 2010 Fair Sentencing Act retroactive, these changes only effected future sentences.

Courts have, however, used the compassionate release provision in Section 3582 to shorten previously imposed mandatory sentences in light of these new provisions. As to the elimination of the 25-year stacking provisions of Section 924(c), several courts have found the disparity between sentences pre-First Step Act and those that would be imposed today an extraordinary and compelling ground for relief. See *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391 (D. Neb. Nov. 14, 2019); *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, (E.D. Va. Mar. 16, 2020); *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475 (D. Kan. Feb. 21, 2020); *United States v. Maumau*, No. 08-cr-00758-TC-11,

7

2020 WL 806121 (Feb. 18, 2020); *United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *10 (M.D. Tenn. Mar. 4, 2020) (vacating sentence and scheduling resentencing hearing).

The fact that the legislative change was not retroactive does not matter. "It is not unreasonable for Congress to conclude that not <u>all</u> defendants convicted under § 924(c) should receive new sentences, even while expanding the power of the courts to relieve <u>some</u> defendants of those sentences on a case-by-case basis." *Mamau*, 2020 WL 806121 at *7 (emphasis in original).

Indeed, since the time of defendant's prior submission at least three more courts have joined the chorus of cases above to reduce stacked 924(c) sentences on similar grounds. *See United States v. Decator*, 2020 WL 1676219 (D. Md., Apr. 6, 2020). *United States v. Wade*, No. 2:99-CR-00257-CAS-3, 2020 WL 1864906, at *6 (C.D. Cal. Apr. 13, 2020)[5]; *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *3 (E.D.N.Y. Apr. 22, 2020). In *Haynes*, Judge Dearie undertook a detailed analysis of the case law in this area and re-sentenced a defendant who had received a sentence of 46 years in prison to time served after he had been in custody almost 27 years. The present public health crisis has likely caused courts reviewing these motions to view the injustice of these sentences with heightened urgency.

Another court has extrapolated from the reasoning in these cases to reduce a sentence life imprisonment in a drug case. *United States v. Hope*, 90 CR 6108 (KMW-2) (April 10, 2020) (slip opinion attached). Because the First Step Act reduced the mandatory sentence to 25 years under the federal "Three Strikes Law," and because it altered the definition of a serious drug

---

[5] The *Wade* case is identified as *United States v. Defendant(s)* on Westlaw.

offense, the Court found the unwarranted disparity between the defendant's sentence and the sentence he would receive today an extraordinary and compelling circumstance warranting a reduction. *Id*. "Mr. Hope's original, mandatory life sentence represents the type of sentencing disparity that the First Step Act was enacted to redress." *Id*. at 8.

The changes to 18 U.S.C. 3553(f) create an entirely analogous situation as to Mr. Kissi: his sentence was excessive and might well be lower if he was sentenced today.

All parties agree that Mr. Kissi would have received a lesser sentence but for the mandatory minimum. The Court explicitly stated as much at sentence. [6] The sole barrier to the defendant receiving the safety valve and thereby avoiding that minimum was the requirement of a truthful proffer with the government. And the rules of the required safety valve proffer changed to a defendant's benefit in the First Step Act. A similarly situation defendant sentenced today might fare differently.

The First Step Act added the following provision to Section 3553(f): "Information disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense." 18 U.S.C.A. § 3553(f). Prior to this revision, a defendant could find his sentence enhanced for admissions about relevant narcotics conduct made in a safety valve proffer. *See United States v. Cruz*, 156 F.3d 366, 375 (2d Cir. 1998).

It is very possible that if this new rule was in place at the time of his proffer Mr. Kissi would have been entirely candid at his safety valve proffer and thereby avoided the mandatory

---

[6] Transcript of sentencing hearing, dated May 13, 2014, at 11 ("I take absolutely no pleasure in sentencing Mr. Kissi to 120 months in jail, but I'm required to do so. Like your attorney, Mr. Kamdang, I believe a guideline sentence would have been an appropriate sentence here, but I have absolutely no discretion.")

9

minimum. One certainly cannot conclusively say it would have made no difference. The rules governing legally significant events –trials, arbitrations, settlement discussions, contract negotiation or proffers – effect their outcomes. Attorneys would not spend the time they do quarreling about procedure were it otherwise.

The significant change to Section 3553(f) surely could have effected Mr. Kissi's case. To the degree the Court finds this contention speculative, there was speculation involved in all of the stacked 924(c) cases where courts granted relief. The maximum penalty for even a single violation of 924(c) remains life in prison; while those defendants surely faced lower Guidelines, the Guidelines are of course merely advisory. Courts that have granted compassionate release have thus relied on likely scenarios were the defendants sentenced today, not certainties. Fairness mandates this Court similarly consider whether the change in Section 3553(f) might have made a difference to Mr. Kissi. *See United States v. Allen*, No. 96-CR-149, 2019 WL 1877072, at *2–3 (D. Conn. Apr. 26, 2019) (First Step Act broadly construed consistent with its remedial purpose) *United States v. Rose*, 379 F. Supp. 3d 223, 229 (S.D.N.Y. 2019) (same). "[A]mbiguities in the First Step Act "must be resolved in the defendant's favor." *Id.* at 229. *See also United States v. Luna*, No. 3:05-CR-58 (SRU), 2020 WL 464778, at *3 (D. Conn. Jan. 29, 2020).

The government contended at the prior conference that the change to the safety valve provision had no bearing on Mr. Kissi's case. The defendant's attempt at the safety valve failed, it said, long before the questioning turned to relevant conduct. The defendant was in effect "shut down" from the beginning.

Yet one never knows what motivates silence. *See e.g. Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (silence "inherently ambiguous" even without regard to the implicit promise contained in

*Miranda* warning that it may not be used). Lawyers routinely advise clients not to answer even the most innocuous questions based on the understanding that an answer to an innocuous question may inevitably lead to a more incriminating one. Perhaps Mr. Kissi reached that conclusion himself.

Even if Mr. Kissi was not specifically concerned relevant conduct, the fact that his answers could be brought up in Court may have contributed to his overall sense that his statements were not confidential. Defendants meeting with the government have a range of possible concerns, including incriminating themselves with relevant conduct, incriminating friends and family, and often most significantly, whether the fact that they are meeting with law enforcement will ever become publicly known. Perhaps to a lawyer, these are distinct concerns, but to a defendant they often merge into a more basic question: "Will these statements leave this room?" At the time of the proffer, the answer was unequivocally "yes." Not so today.

The standard proffer agreement, pre-First Step Act, only served to compound a defendant's overall concern that speaking might not be "safe" – a concern which incorporates both repetition of statements to the Court *and* to the world at large. Defendants are promised their statements cannot be used against them, and then given a litany of exceptions. Lawyers try to translate these words into simple terms, but simple terms truly do not explain the concepts. Many are left with a vague at best understanding and simply take their lawyers advice that it makes sense to talk. But a criminal defendant "often mistrusts his counsel, who, in most instances, has been assigned and not chosen," *United States v. Vinas*, 910 F.3d 52, 61 (2d Cir. 2018) (quoting *United States v. McElroy*, 697 F.2d 459, 465 (2d Cir. 1982)), and many come to the conclusion that it is all a "trap."

Whatever motivated Mr. Kissi to "shut down" cannot be known today. The simple assurance added to Section 3553(f) might well have changed his mind. It is impossible to say it would not have. Mr. Kissi was, after all, in the uniquely stressful situation of sitting down to meet with the very same prosecutors and agents who had just worked tirelessly to convict him. Anything which highlighted the confidentiality of the meeting might have made a difference.

In short, Congress has chosen to afford defendants today protections that Mr. Kissi was not given, materially changing the dynamic in safety valve proffers. A comparable defendant might make a different decision today because of the change, and receive a dramatically different sentence. The disparity between Mr. Kissi's sentence and a comparable defendant today is a compelling and extraordinary ground for compassionate release under the logic of *Hope* and the stacked 924(c) cases discussed above. And the fact that Congress chose not to make this provision retroactive does not change this fact. As noted in the context of the 924(c) changes "It is not unreasonable for Congress to conclude that not <u>all</u> defendants . . . should receive new sentences, even while expanding the power of the courts to relieve <u>some</u> defendants of those sentences on a case-by-case basis." *Mamau*, 2020 WL 806121 at *7 (emphasis in original). Mr. Kissi's sentence – 10 years for a first-time offender in a narcotics conspiracy who played a minor role and had always worked to support his family – is exactly the sort that warrants individual relief, especially where he has already served the bulk of that sentence and now faces significant risks to his health in prison.

### D. Regardless of the Change to the Safety Valve, the Excessiveness Of the Defendant's Sentence Relative to his Crime is Grounds for Relief.

Even if the Court finds the possibility the defendant would have received the safety valve too speculative a basis on which to grant relief, the length of the defendant's sentence remains an appropriate ground, particularly coupled with the unique threat posed by COVID-19.

12

A statutory change to the sentence is not a prerequisite for relief. For example, in *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058 (S.D.N.Y. Apr. 6, 2020), the defendant was the leader of a drug trafficking organization responsible for selling more than 500 kilograms of heroin. He was convicted of leading a Continuing Criminal Enterprise under 21 U.S.C. 848(b) and was sentenced to a mandatory term of life in prison. Unlike in the *Hope* case or the 924(c) cases discussed above, that statutory penalty has not changed. If sentenced today, the defendant would still face mandatory life in prison. The Court nonetheless, reduced his sentence to time served after roughly 30 years. In so doing the Court explained the broad discretion intended under Section 3582 permitting a court to remedy "an unusually long sentence," writing:

> First, in passing the statute, Congress empowered district courts, not the U.S. Parole Commission, as previously, to decide in individual cases if "there is a justification for reducing a term of imprisonment." See S. Rep. No. 98-225, at 56 (1983). Put differently, Congress envisioned 18 U.S.C. § 3582(c)(1)(A) acting as a "safety valve[ ] for [the] modification of sentences" and intended for district courts to be able to reduce sentences when justified by the various factors and reasons that the U.S. Parole Commission previously had considered in making parole determinations. Id. at 121. Lawmakers further noted that the foregoing approach would keep "the sentencing power in the judiciary where it belongs," rather than with the U.S. Parole Commission, and that 18 U.S.C. § 3582(c)(1)(A) would allow for the "later review of sentences in particularly compelling situations." Id. This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when "extraordinary and compelling reasons" indicate that the sentence initially imposed on any individual defendant no longer served legislative objectives.
>
> Second, although the power to reduce sentences provided for by 18 U.S.C. § 3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or terminally ill defendants, nothing in the statutory language or legislative history of 18 U.S.C. § 3582(c) indicates that Congress intended to limit its application to elderly defendants or defendants with compelling medical circumstances. Rather, if a judge finds the existence of any "extraordinary and compelling reasons" warranting a sentence reduction, those reasons could, pursuant to 18 U.S.C. § 3582(c)(1)(A), form the legal basis for the reduction "of an unusually long sentence." Id. at 55-56. Indeed, the legislative history of 18 U.S.C. § 3582(c)(1)(A) indicates that lawmakers thought that "extraordinary and compelling reasons" for a sentence reduction should not be limited to

medical condition, age, and family circumstances. In particular, recognizing that parole had historically played a key role in the federal criminal justice system, legislators explained how some defendants may warrant a sentence reduction (after service of some period of incarceration) based on any number of "circumstances:"

"The [Senate Judiciary] Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, <u>cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence</u>, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment."

Id. at * 5-6 (quoting Senate Report at 55-56) (emphasis added by district court). Here, as in *Millan*, the mandatory sentence imposed on Mr. Kissi is "unusually long" and no longer serves "legislative objectives." *Id*. And as previously argued, the fact that the Court understood Mr. Kissi's sentence to be excessive at the time it was imposed does not preclude the Court from considering that fact now. *See* U.S.S.G. § 1B1.13, Application Note 2 (extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment.").

      The fact that the defendant may have mishandled his case by declining to participate in a safety valve proffer is, also, of no import. Indeed in the stacked 924(c) cases the defendants typically made similar strategic errors in going to trial. In *Redd*, the defendant withdrew from a plea involving two 924(c) counts and a recommended sentence of 340 months, only to be convicted at trial of an additional 924(c) count resulting in a sentence of 603 months. *Redd*, 2020 WL 1248493 at * 2-3. *See also Wade*, 2020 WL 1864906 at n. 3 (noting that the defendant's more culpable co-defendants pled guilty or signed cooperation agreements and had been released from prison). Judge Dearie discussed throughout the *Haynes* case that the sentence was in effect a penalty for going to trial. "Haynes has served . . . more than three times the length of the high end of the sentence he would have received had he pled guilty (101

14

months, or 8 years and five months). And he still has an additional 13 years to serve." *Haynes*, 2020 WL 1941478, at *2. Even though going to trial was "ill-advised" or perhaps even "foolish," it was his right. Id. at *17. If Mr. Kissi's decision to shut down during the safety valve proffer was similarly foolish, it was similarly his right and does not preclude relief from a patently excessive sentence.

Nor should it matter that the defendants in the above cases received sentences far longer than the 10-year term imposed on Mr. Kissi. They should have. Relative to his crime, Mr. Kissi's sentence is comparably unjust. The defendants in the stacked 924(c) cases committed multiple crimes involving firearms. Mr. Millan ran a major drug trafficking organization. The defendant in *Hope* was a recidivist. Mr. Kissi was a first-time drug offender with a minimal role who had always worked. His case involved just over a kilogram of heroin, barely triggering the minimum. Nobody believed deserved a 10-year term. And like all the defendants discussed above, Mr. Kissi has served a significant portion of his plainly excessive term. Yet unlike those defendants, who had decades remaining, Mr. Kissi will serve much of the remainder of his term under risk to his health.

One final point bears noting concerning the relationship between the defendant's two arguments. The conditions in the BOP mean that the sole purpose served by Mr. Kissi's continuing incarceration is incapacitation at this point. Even though he is a low security inmate, who was permitted to self-surrender and assigned to the "cadre" work program, practically all BOP inmates are now confined to their cells 23 hours a day. All educational and rehabilitative programs appear to have stopped in light of the BOP's COVID-19 action plans. Nobody would view this as "just punishment" for Mr. Kissi. Whatever legitimate purpose a 10-year sentence might have once served, it now only serves the goal of incapacitation, and does so at the risk of

Mr. Kissi's health. Given the nature of his offense and his history and characteristics, "the sentence initially imposed . . . . no longer serves legislative objectives," justifying relief under Section 3582. *Millan*, 2020 WL 1674058, at * 5.

**Conclusion**

For the foregoing reasons, Mr. Kissi respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement.

                                                 Respectfully Submitted,

                                                 _____/s/_____
                                                 Michael D. Weil
                                                 Federal Defenders of New York
                                                 One Pierrepont Plaza
                                                 Brooklyn, NY 11201
                                                 (718) 407-7413
                                                 Michael_weil@fd.org

April 29, 2020
Brooklyn, New York


    TO:

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

Attention AUSA Erik Paulsen